FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE FIRST CIRCUIT

---

**BAP NO. MB 22-036**

---

**Bankruptcy Case No. 19-14253-CJP**
**Adversary Proceeding No. 20-01034-CJP**

---

**NICHOLAS ANTHONY SIVIERI, III,**
**Debtor.**

---

**JÚLIO A. SIMÕES and EDUARDO S. PEREIRA,**
**Plaintiffs-Appellants,**

**v.**

**NICHOLAS ANTHONY SIVIERI, III,**
**Defendant-Appellee.**

---

**Appeal from the United States Bankruptcy Court**
**for the District of Massachusetts**
**(Hon. Christopher J. Panos, U.S. Bankruptcy Judge)**

---

**Before**
**Lamoutte, Cabán, and Fagone,**
**United States Bankruptcy Appellate Panel Judges.**

---

**Peter Cole, Esq., on brief for Plaintiffs-Appellants.**

**Lane N. Goldberg, Esq., on brief for Defendant-Appellee.**

---

**March 5, 2024**

---

**Fagone, U.S. Bankruptcy Appellate Panel Judge.**

A construction jobsite accident soured the business relationship between the appellants, Julio Simões and Eduardo Pereira, and the appellee, Nicholas Sivieri. After the accident, Simões and Pereira maintained that they had been employees of Sivieri's company. They jointly pursued two distinct sets of claims in different forums: workers' compensation insurance claims and wage law claims. Addressing those claims, Sivieri expressed divergent beliefs about whether Simões and Pereira had been employees or independent contractors.

The parties' current dispute stems only from the wage law claims. Simões and Pereira invoked two strict liability statutes under Massachusetts wage law to assert that they had been misclassified as independent contractors and, in turn, deprived of an employee entitlement to overtime pay. A state court agreed and entered judgments against Sivieri and his company, awarding mandatory multiple damages to Simões and Pereira.

Nearly eight years later, Sivieri filed a petition under chapter 7, seeking to eliminate his debts, including the debts owed to Simões and Pereira. They then sought a determination that the debts were excepted from discharge by virtue of 11 U.S.C. § 523(a)(6). That is, although their judgments were awarded under strict liability statutes without regard to Sivieri's intent, they contended that Sivieri had willfully and maliciously injured them, rendering the debts immune from Sivieri's discharge. They thus needed to prove, among other factors, that Sivieri had acted with the requisite intent. We agree with the bankruptcy court that they failed to do so.

## BACKGROUND

This appeal comes to us following entry of a final judgment after a bench trial in an adversary proceeding. Simões, Pereira, their workers' compensation attorney, and Sivieri testified during the trial. Nearly 600 pages of documents were admitted in evidence. Taking the

evidence, witness credibility, and applicable law into account, the bankruptcy court issued a written bench ruling, concluding that Simões and Pereira failed to meet their burden of proof under § 523(a)(6). Accordingly, the bankruptcy court entered a judgment in Sivieri's favor. Simões and Pereira now appeal from that judgment, asserting errors in both factual findings and legal conclusions.

To set the stage for our analysis, we start by reciting some of the bankruptcy court's factual findings. Although the bench ruling contains a section entitled "Findings of Fact," identifying many factual findings, the court also points to or recites the existence of certain testimony on particular facts, or recognizes conflicting testimony on different facts, all without making explicit findings on those facts. For purposes of our review, we will assume that, on disputed questions of material fact, the court made findings of fact that are consistent with, and support, the court's ultimate decision, namely, the entry of judgment in favor of Sivieri.

Simões and Pereira are brothers who became carpenters and framers by trade after moving to the United States from Brazil. They speak Portuguese and some to little English. As is pertinent here, they each performed services within their skill sets for two companies—MFN, LLC, and NAS Development, LLC—both of which involved Sivieri. As to MFN, there was conflicting information about whether Sivieri held an ownership interest and the extent of his management role. As to NAS, however, Sivieri owned and operated it.

Simões and then later Pereira, too, worked for MFN and NAS on jobsites constructing sizeable single-family homes in Massachusetts. A particular project on Martha's Vineyard was key in their claims under state wage law. That project began under MFN and then transitioned to NAS. Simões and Pereira worked as part of a framing crew that included other Brazilians who spoke only Portuguese. The parties dispute the extent to which Sivieri controlled Simões and the

3

crew during their work for MFN and NAS, but Simões had assembled the crew and had authority over it. Sivieri spoke no Portuguese. Simões communicated instructions to the crew. Simões also kept records of his, Pereira's, and other crew members' weekly hours, emailing the information to a woman who served as the office administrator for MFN and then NAS.

Simões and Pereira had six-day workweeks, with long hours and no vacation. They were paid for all the hours they worked, but they were not paid an overtime premium. There may not have been a written contract between the parties, as none was included in the record, but no party had any expectation that overtime would be paid. As to other crew members, no evidence established how they were paid. Whether amounts paid to Simões and Pereira might have included payment for hours worked by others is unclear. Testimony conflicted about whether income tax forms were issued to Simões and Pereira and whether certificates of insurance were obtained from them, but neither item appeared in the record.

In the end, Simões and Pereira were hurt in a jobsite accident.[1] Aiming to limit NAS's liability, Sivieri sought to have workers' compensation insurance cover the resulting claims, taking the position that Simões and Pereira had been NAS's employees. Before then, however, Sivieri had seemingly taken the position that they were independent contractors, apparently believing that he could classify them as such.[2]

---

[1] The bankruptcy court's bench ruling does not provide details, but the record shows no dispute that, soon after Simões and Pereira had finished their work on the Martha's Vineyard project, their accident occurred on a different jobsite in September 2010.

[2] One terminology refinement warrants explanation here. In wage law parlance, "independent contractor" is the term typically contrasted with "employee." The bankruptcy court and the parties have used "independent contractor," as well as "subcontractor," seemingly interchangeably. The term "subcontractor" is sometimes used in various contexts to denote layering in business relationships, which is neither necessary to the wage law discussion herein nor evidently contemplated by the parties as an important point of distinction. Thus, for consistency and clarity, we use "independent contractor" throughout.

4

Sivieri knew that classifying workers as employees came with certain costs to his business, including increased administrative obligations and workers' compensation insurance premiums. He was aware that classifying workers as independent contractors instead could avoid such costs but came with some risk of being disputed. He willingly took that risk when classifying Simões and Pereira as independent contractors. He believed such classification to be typical in the construction industry and used it as his default approach to workers.

Also after the accident, Simões and Pereira brought state wage law claims against both NAS and Sivieri. Simões and Pereira asserted that they were employees who had been misclassified as independent contractors (under the "independent contractor statute," Mass. Gen. Laws ch. 149, § 148B) and, in turn, had been deprived of overtime pay to which employees are entitled (under Mass. Gen. Laws ch. 151, § 1A). As evidenced by judgments entered in their favor, Simões and Pereira prevailed on these strict liability claims.[3] Simões and Pereira were each awarded amounts for overtime pay, interest, multiple damages, and attorney's fees.

## STANDARD OF REVIEW

The appellants contend that the bankruptcy court erred in applying the law to the facts. They also challenge multiple factual findings. The bankruptcy court's legal conclusions are reviewed de novo. Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 107 (1st Cir. 1997). Findings of fact are reviewed for clear error. Id.

The clear error hurdle is, by design, high. To constitute clear error, a finding must strike the panel "as more than probably wrong—it must prompt a strong, unyielding belief, based on

---

[3] Two judgments reissued by the state court in April 2012 were included in the record. The state court's order dated March 7, 2012, which is referenced on each judgment, was not included in the record. No party has questioned the absence of that order from the adversary proceeding. We assume that it did not include findings that could have had preclusive effect here. See 28 U.S.C. § 1738; Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 80-81 (1984).

the whole of the record, that the [bankruptcy court] made a mistake." Toye v. O'Donnell (In re O'Donnell), 728 F.3d 41, 45 (1st Cir. 2013) (internal quotation marks omitted). If a challenged finding is "supportable on any reasonable view of the record," then that finding must be upheld on appeal. Hernandez v. Shove (In re Shove), 638 B.R. 1, 14 (B.A.P. 1st Cir. 2022), aff'd, 83 F.4th 102 (1st Cir. 2023). Stated differently, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985).

## ANALYSIS

As indicated, the outcome of this appeal turns on whether the bankruptcy court erred in concluding that Simões and Pereira failed to meet their burden of proving that Sivieri had the requisite intent. More precisely, it turns on whether they established that Sivieri knew or believed enough about worker classifications—employee versus independent contractor—at the relevant time, such that he could have deliberately misclassified Simões and Pereira as independent contractors, depriving them of a legal right to overtime pay. As is often the case when a defendant's knowledge, state of mind, or intent is in question, the court's determination is based largely on circumstantial evidence and reasonable inferences from it. Our analysis focuses on Simões and Pereira's arguments of error relating to this knowledge piece of the intent question. Because we conclude that the bankruptcy court committed no reversible error in determining that Simões and Pereira failed to meet their burden of proving intent, we find it unnecessary to reach certain unrelated arguments raised by Simões and Pereira.

## I.    Nondischargeability Under § 523(a)(6) of the Bankruptcy Code

Some debts cannot be eliminated in bankruptcy. If a debtor has caused a "willful and malicious injury" to someone else, any debt arising from that injury can be nondischargeable.

6

11 U.S.C. § 523(a)(6).  A creditor claiming that a debt fits within this description bears the burden of proving that assertion by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279, 291 (1991).

Because the phrase "willful and malicious injury" and its components are not defined in the Code, courts are left to derive meaning from other sources with similar concepts, often the Restatement of Torts.  See Albert v. Nason (In re Nason), 654 B.R. 644, 647, 648 & n.3 (Bankr. D. Me. 2023) (collecting cases and referencing instructive sections and comments within Restatement (Second) of Torts).  The inaugural edition of the Restatement of Torts was published several decades after the phrase "willful and malicious injury" first appeared in bankruptcy law in the late 1800s, when the modern concept of "intentional torts" was only just forming, and while general thinking about liability for intended consequences was evolving.  Nevertheless, the substantial overlap between the "willful and malicious injury" phrase, as interpreted, and more modern views on civil liability for intended consequences, as offered in the Restatement, is apparent.  Compare, e.g., Tinker v. Colwell, 193 U.S. 473 (1904), and DeWitt v. Stewart (In re Stewart), 948 F.3d 509, 528 (1st Cir. 2020), with Restatement (Second) of Torts § 870 & cmts. a-o.

To examine whether an injury was both "willful" and "malicious," courts often define and then analyze the two modifiers independently.[4]  Taking "willful" alone, the record supports

_____

[4] Simões and Pereira contend that the bankruptcy court erred by not explicitly performing a separate analysis for malicious injury.  We are unpersuaded.  Simões and Pereira needed to establish that the alleged injury was both willful and malicious.  The bankruptcy court acknowledged malice as a separate element with an objective component.  Because the bankruptcy court concluded, however, that Simões and Pereira failed to establish that Sivieri had the requisite intent for willfulness (discussed below), perhaps the bankruptcy court saw no need to analyze malice separately.  We agree that such analysis would be unnecessary here.

the bankruptcy court's determination that Simões and Pereira failed to meet their burden of proof.

## A. Willful Injury

A debtor causes a willful injury through a voluntary act of more than mere negligence or recklessness. Kawaauhau v. Geiger, 523 U.S. 57, 61-62, 64 (1998). The debtor must have desired the consequence of the voluntary act or at least believed that the consequence was substantially certain to result. See McAlister v. Slosberg (In re Slosberg), 225 B.R. 9, 17-19 (Bankr. D. Me. 1998) (citing Restatement (Second) of Torts § 8A & cmt. b); see also Geiger, 523 U.S. at 60, 61-62, 63 (citing Restatement (Second) of Torts § 8A cmt. a). The creditor can establish the debtor's desire or belief at the relevant time through direct and circumstantial evidence. Trenwick Am. Reins. Corp. v. Swasey (In re Swasey), 488 B.R. 22, 34-41 (Bankr. D. Mass. 2013). Such evidence must manifest the debtor's subjective perception. Carrillo v. Su (In re Su), 290 F.3d 1140, 1142-46 (9th Cir. 2002); see also In re Swasey, 488 B.R. at 34-41. That is, the creditor cannot meet the burden of proof by showing only what a reasonable person would or should realize in the circumstances because such a showing would not establish that the debtor acted with more than negligence or recklessness, as is required. In re Su, 290 F.3d at 1145-46; see also Sega Auto Sales, Inc. v. Flores (In re Flores), 535 B.R. 468, 486-87 (Bankr. D. Mass. 2015) (observing that substantial certainty analysis "must be subjective and rooted in what the debtor actually knew" and "requires that [the court] nonetheless consider the [d]ebtor's subjective intent, even if his beliefs were wholly unreasonable"). The creditor can, however, meet the burden of proof by showing circumstantial evidence of the debtor's knowledge or beliefs so as to sufficiently contradict that debtor's self-reported perspective. In re Su, 290 F.3d at 1146 n.6.

8

### 1.    Act and Consequence

As indicated above, an act and a consequence are fundamental to a willful injury.  Before turning to the alleged act here, it is helpful to have the alleged consequence in mind.  Although Simões and Pereira were paid for all hours worked, they were not paid an overtime premium.  The alleged act leading to that consequence was worker classification, a concept that requires some unpacking, beginning with a primer on state law.

In general, at least for this discussion, worker classification involves two possibilities—employee or independent contractor.  The "employee" or "independent contractor" determination is not necessarily universal because the state legal standard varies for different worker classification purposes (e.g., wage-related requirements, workers' compensation, unemployment insurance, and income tax withholding).  Camargo's Case, 96 N.E.3d 673, 679-80 (Mass. 2018); see also id. at 681-82 (Gants, J., concurring) (observing that "patchwork statutory scheme" can cause "confusion and uncertainty" for those attempting to comply with varied legal standards for determining each worker's classification).

Here, classification fell under the independent contractor statute, applicable to parts of state wage law that are largely intended to protect only employees, including through overtime pay provisions.  See Mass. Gen. Laws ch. 149, § 148B(d).  The independent contractor statute establishes a rebuttable presumption that "an individual performing any service" is an employee.  See Mass. Gen. Laws ch. 149, § 148B(a); Depianti v. Jan-Pro Franchising Int'l, Inc., 990 N.E.2d 1054, 1066-67 (Mass. 2013); see also Monell v. Boston Pads, LLC, 31 N.E.3d 60, 64-65 (Mass. 2015) (recounting statute's origins and aims).  That is, for the statute's purposes, workers are presumed to be employees (whether hired to be or not).  The opportunity to rebut that presumption arrives typically in a formal legal setting, after a worker claims to have not received

9

employee benefits or protections that are required under applicable wage law. The independent contractor statute sets forth the criteria for rebutting the presumption—that is, for showing that the worker is an independent contractor rather than an employee:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> (2) the service is performed outside the usual course of the business of the employer; and,
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a).

Informally, before any legal challenge arises, the statutory criteria serve as the guide for those who need to determine whether to treat a worker as an employee or independent contractor. Correctly classifying a worker as an independent contractor is not always straightforward. As is evident, the criteria are written in broad terms, requiring facts to be supplied and circumstances to be interpreted. The latitude in the criteria leaves open the opportunity at the outset for manipulations (not necessarily in bad faith), miscalculations, and mistakes. That is, an initial classification that is later shown to be incorrect may not have been deliberate. It also may not be knowable until a final adjudication determines that a putative employer failed to muster sufficient facts to show that a worker's services were performed as an independent contractor, leaving only the default status of employee.

An error can be costly. An incorrect determination that a worker is an independent contractor rather than an employee can lead to civil and criminal liability. See Mass. Gen. Laws ch. 149, § 148B(d). Thus, there is an incentive to classify all workers as employees—or at least

10

not to rashly classify them as independent contractors—but that assumes some familiarity with the statute.

An incorrect classification is often referred to as a "misclassification"—retroactively relabeling the act of classification in a way that might suggest a misdeed or malfeasance. The intentions behind the act or whether it was done in good or bad faith, however, are not factors in the statutory criteria. See Mass. Gen. Laws ch. 149, § 148B. Thus, "misclassification" simply means incorrect classification, without regard to how or why it happened. In other words, the independent contractor statute creates a strict liability regime. Somers v. Converged Access, Inc., 911 N.E.2d 739, 749 (Mass. 2009). Likewise, strict liability is imposed for certain failures to comply with wage-related law, including overtime pay provisions. Id.; see Mass. Gen. Laws ch. 151, § 1B (setting forth liability for failure to pay overtime premium to employee, including mandatory "treble damages, as liquidated damages").[5]

With this state law backdrop, we can delve further into the "act" and "consequence" in the willfulness analysis. Again, the act was Sivieri's classification of Simões and Pereira as independent contractors for purposes of wage law, with the consequence then being that Simões and Pereira were not paid an overtime premium.

---

[5] In some contexts, a treble damages award is punitive for outrageous conduct. Such was previously the case with certain wage law violations, including failure to pay overtime compensation. See e.g., Goodrow v. Lane Bryant, Inc., 732 N.E.2d 289, 299 (Mass. 2000) (describing intent requirement for multiple damages award under now superseded version of Mass. Gen. Laws ch. 151, § 1B). In 2008, however, wage law amendments, including to the relevant overtime compensation statute (Mass. Gen. Laws ch. 151, § 1B), made treble damages mandatory and characterized them as "liquidated," removing the need for courts to consider intent when awarding treble damages. See generally George v. Nat'l Water Main Cleaning Co., 77 N.E.3d 858, 860-66 (Mass. 2017) (discussing equivalent 2008 amendment to statute setting forth liability for certain other wage-related deprivations). The 2008 amendments preceded the 2010 wage law claims and the 2012 judgments here. Thus, the multiple damages awarded to Simões and Pereira are not indicative of the state court having made a finding on Sivieri's intent.

The classification act itself can be minimal, merely making a decision. Such minimality, by itself, does not indicate that anything is amiss because no formal pronouncement or contract is required to classify a worker as an independent contractor. See Depianti, 990 N.E.2d at 1066-67.[6] One's classification decision might be gleaned only from further events—that is, it might only be gleaned from the consequences of the classification act. For example, treatment of a worker in compliance with wage-related statutes might reveal a belief that the worker is an employee. Alternatively, it might reveal the putative employer's desire to avoid the risk that a later attempt to rebut the employee presumption would be unsuccessful. When a worker is not being treated in compliance with wage-related statutes, the classification might be harder to decipher. Noncompliance might suggest an ignorance of wage law. It might also suggest that a worker has been classified as an independent contractor.

The bankruptcy court's findings suggest that Sivieri took little action, if any, that could be conclusively construed as Sivieri having treated Simões and Pereira as employees. Based on testimony and other record evidence, discussed below, the bankruptcy court seemed to accept that Sivieri viewed—i.e., that he classified—Simões and Pereira as independent contractors for the duration of their business arrangement. Consistent with such a classification, Simões and Pereira were not paid an overtime premium.

### 2. Injury

So far, for the willfulness analysis, there is a voluntary act (Sivieri's classification of Simões and Pereira as independent contractors for purposes of wage law) and the consequence of

---

[6] Depianti concludes that, notwithstanding the reference to "contract" in the independent contractor statute, Mass. Gen. Laws ch. 149, 148B(a)(1), no contract is required for independent contractor status, but a contract, if any, would be considered in a putative employer's effort to rebut the employee presumption. Parties might have agreed to an "independent contractor" classification through a contract, but it would not be determinative under the statute.

12

that act (Simões and Pereira were not paid an overtime premium). In general, for that consequence to be an "injury," Simões and Pereira must have been deprived of something to which they were legally entitled. See In re Nason, 654 B.R. at 648 n.3 (citing Geiger v. Kawaauhau (In re Geiger), 113 F.3d 848, 852 (8th Cir. 1997) (en banc), aff'd sub nom. Kawaauhau v. Geiger, 523 U.S. 57; and citing Restatement (Second) of Torts § 7 & cmt. a) (discussing "injury" concept)). If they had been independent contractors, wage law would not have entitled them to overtime pay and thus no deprivation would have been possible. Through their state court action under wage law, however, Simões and Pereira established that they were employees. That is, in defending that action, Sivieri failed to rebut the employee presumption.[7] Being deemed employees, Simões and Pereira thus established that they were entitled to overtime pay and that they had been deprived of it, as evidenced by their respective judgments against Sivieri. Thus, as inferred from the judgments, Simões and Pereira can show an injury based on Sivieri having been found liable under strict liability statutes (for misclassifying Simões and Pereira as independent contractors and then, correspondingly, for having failed to pay them an overtime premium as employees).

### 3. Intent

As the trial court observed: "Violation of a state strict liability statute alone is insufficient to demonstrate the requisite intent to injure required by § 523(a)(6)." Simões v. Sivieri (In re Sivieri), Ch. 7 Case No. 19-14253-CJP, Adv. No. 20-01034-CJP, 2022 WL 4586507, at *9 (Bankr. D. Mass. Sept. 29, 2022); see also id. at *7-9 (summarizing and referencing Orr v. Marcella (In re Marcella), 463 B.R. 212 (Bankr. D. Conn. 2011), which addressed § 523(a)(6)

---

[7] No findings or analysis from the state court were included in the record. Thus, the nature of Sivieri's failure to rebut the employee presumption is unknown.

applicability to debt arising from similar strict liability wage statute in Connecticut). A strict liability finding requires no consideration of the actor's intent and can follow from, for example, an accidental violation. An accidental violation could result from recklessness or negligence, which, under Geiger, would not be enough for a willful injury. See Geiger, 523 U.S. at 61-62, 64. Rather, as noted, the debtor must have acted intending to cause the injurious consequence by desiring it or by at least believing that it was substantially certain to result.

To show that Sivieri caused injury more than negligently or recklessly, Simões and Pereira needed to show that Sivieri was aware, *before* their business arrangement ended, that he was *mis*classifying them as independent contractors and that he at least knew about injurious consequences under wage law that would be substantially certain to result (namely, the deprivation of a right to overtime pay to which employees may be entitled).

If Sivieri thought, perhaps even unreasonably, that Simões and Pereira qualified as independent contractors, he cannot have desired or believed that they would be deprived of wage law protections that do not apply to independent contractors—such as an entitlement to an overtime premium. To show the requisite intent, Simões and Pereira would seemingly need evidence that, while they were working with him, Sivieri had some degree of awareness that he could not rebut the employee presumption—i.e., that Simões and Pereira were performing services such that the statutory criteria for independent contractor would not be satisfied. If Sivieri knew nothing of the independent contractor statute and its criteria, perhaps other paths could be taken toward showing his desire, knowledge, or belief that his action would cause an injurious consequence. Whatever the path, Simões and Pereira generally needed to show, by a preponderance of the evidence, that Sivieri believed that they were "employees" but then

14

nevertheless misclassified them as independent contractors, intentionally depriving them of wage law protections.

### (a) Bankruptcy Court's Intent-Related Findings & Conclusions

Before we dive into the bankruptcy court's intent-related findings and conclusions, the relevant timeframe should be brought into focus. Nothing in the record suggests that Simões and Pereira worked with Sivieri after the accident. Thus, Sivieri's knowledge before and around the time of the accident is relevant with respect to his intent. Specifically, it seems that Sivieri's knowledge and beliefs before the end of September 2010 are relevant. The record indicates that the jobsite accident occurred on September 11, 2010, and that a final check dated September 28, 2010, was issued to Pereira for work performed through the date of the accident. The workers' compensation insurance claims and the wage law claims of Simões and Pereira came soon after—by or around November 2010. By then, Sivieri's knowledge and beliefs may have changed in connection with learning about the legal claims against him. What matters here, however, is Sivieri's knowledge and beliefs while the business relationship was ongoing because, in the circumstances as alleged, Sivieri generally cannot have misclassified Simões and Pereira with an intent to deprive them of overtime pay after their business relationship ended. Cf. Cordeiro v. Kirwan (In re Kirwan), 558 B.R. 9, 13-14 (Bankr. D. Mass. 2016) (concluding that conduct occurring after debt's establishment via state court judgment could not serve as additional basis for § 523(a)(6) nondischargeability because conduct occurred after the alleged injury and thus could not have given rise to debt in question).

The bankruptcy court was not persuaded that "[Sivieri] intentionally avoided a known legal obligation[.]" In re Sivieri, 2022 WL 4586507, at *8. The bankruptcy court found that Sivieri "viewed classification of employees or [independent contractors] as a flexible and

15

convenient means to an end that had costs and benefits to his business." Id. at *5. These findings indicate that Sivieri was aware that classifying workers as independent contractors resulted in less expense and administrative burden for his business.[8] The findings also indicate that, during their business arrangement, Sivieri treated Simões and Pereira as independent contractors, at least by not agreeing to pay and not paying them an overtime premium, while being "willing to take the risk that their classification as [independent contractors] could be challenged." See In re Sivieri, 2022 WL 4586507, at *5; see also id. at *8. Sivieri's inconsistent, implausible, and unsupported explanations led the bankruptcy court to find that he was not credible in much of his testimony. The bankruptcy court did, however, "credit [Sivieri's] testimony . . . that he believed at the time that he had the right to classify workers as [independent contractors], it was his general practice, and he perceived it to be a common practice in the construction industry." Id. at *5. The bankruptcy court credited Sivieri's testimony about his belief because other evidence "at least equally" supported it. Id. at *8. Although the bankruptcy court's crediting of Sivieri's testimony on this point might not have been an explicit finding that it accepted the testimony as Sivieri's actual belief, the context makes

---

[8] The timing and extent of the details of that awareness are unclear from the findings, but, for this discussion, we assume that Sivieri was generally aware of these well-known advantages while Simões and Pereira were working with him. The record supports that Sivieri had at least some idea of advantages related to income tax withholding. The record also supports that Sivieri was at least somewhat aware, at the relevant time, that employees could be entitled to overtime pay, whereas independent contractors would not be. Such general awareness, however, would not alone establish that Sivieri had knowledge or beliefs about the specific wage law criteria for classifying workers as independent contractors or employees. As the bankruptcy court noted, Sivieri testified to his belief that Simões and Pereira were independent contractors because employee-related income tax withholding forms had not been completed. That factor is not among the criteria in the independent contractor statute, see Mass. Gen. Laws ch. 149 § 148B(a), and failing to withhold income tax does not factor into the analysis of whether a worker is an independent contractor. Mass. Gen. Laws ch. 149 § 148B(b) ("The failure to withhold federal or state income taxes or to pay unemployment compensation contributions or workers compensation premiums with respect to an individual's wages shall not be considered in making a determination under this section.").

16

clear that the bankruptcy court accepted that account. Thus, for purposes of addressing the appeal, we have treated the crediting as a factual finding, reversible only for clear error.

The bankruptcy court observed that, before Simões and Pereira made their misclassification claims in court, Sivieri had not been confronted with such claims, indicating that he may not have been on notice of any faulty understanding of independent contractors versus employees.

The bankruptcy court also rejected the idea that Sivieri might have been aware of classification issues. It declined to infer from Sivieri's training and experience that he knew his company was violating wage law. See In re Sivieri, 2022 WL 4586507, at *5, *8 (referencing evidence offered by Simões and Pereira but concluding that intentional violation not established by evidence). It likewise declined to infer any classification-related knowledge from a listing of two unidentified carpenters as employees on a workers' compensation insurance application signed by Sivieri for MFN.[9] It also declined to infer from Simões's and Pereira's immigrant status and related factors that Sivieri had chosen them as workers based on allegedly believing

_____

[9] Sivieri disavowed having signed the application and disputed that MFN had ever employed carpenters. The bankruptcy court rejected this testimony as being "not credible." In re Sivieri, 2022 WL 4586507, at *4. The bankruptcy court declined, however, to infer that Simões and Pereira were the carpenters referenced on the application. The record offers little, if any, support for such an inference. The application was dated in April 2007 (about a month after MFN was organized). Based on his limited descriptions of periods spent working on three MFN projects, Simões's work could have begun in 2007, but the record does not make clear when. With Pereira, the record supports that he began working with MFN in 2009. The record does not compel one to conclude that either Simões or Pereira is referenced on the April 2007 application. Moreover, for workers compensation insurance purposes, there are coverage-based incentives for identifying workers as employees, see infra note 13, and such an identification would not necessarily indicate that the workers were also considered to be employees for wage law purposes.

17

that they would be less likely to know their rights or complain about violations.[10]  The bankruptcy court also declined to credit Simões's testimony that he had once asked Sivieri about overtime and had been rebuffed, noting that, although "generally very credible," Simões had failed to recall such a conversation when making discovery disclosures in connection with his wage law claims a decade earlier.  See In re Sivieri, 2022 WL 4586507, at *4, *8 (referencing Trial Ex. 58).[11]

Finally, to the extent that a financial gain could suggest something about Sivieri's intent, the bankruptcy court found "no credible material evidence" of it.  In re Sivieri, 2022 WL 4586507, at *5.  The bankruptcy court acknowledged that there could be "perhaps an inference" that not paying overtime gave Sivieri's company "a bidding advantage" on projects but that there was "no evidence" of any such advantage having personally benefitted Sivieri.  Id.

---

[10]  On this point, Simões and Pereira insist that the bankruptcy court found that Sivieri acted unfairly. It did not.  Rather, the bankruptcy court acknowledged that Simões and Pereira had requested an inference and that *they* had "raised substantial concerns."  See In re Sivieri, 2022 WL 4586507, at *5, *8, *9.  The bankruptcy court did not adopt those concerns as its own, as Simões and Pereira suggest.  Further, the record has no evidence that Sivieri targeted Simões or Pereira (or others) for the purpose of deliberately depriving them of employee protections.  The record could, however, support an anodyne view of how their business relationship with Sivieri began.  Simões testified that he worked as a carpenter "for many companies" before working with Sivieri.  Simões's testimony also indicated that—about three years after he arrived in the United States and began work as a carpenter—"Fernando," another Brazilian immigrant who was believed to have had an ownership interest in MFN, brought Simões in to perform services for MFN.  Simões mentioned working on two significant year-long projects for MFN before beginning the project on Martha's Vineyard, during which MFN was dissolved.  Simões also testified that, after MFN was dissolved and Fernando had moved on, Simões continued working with Sivieri.  For his part, Pereira testified that—about four years after he arrived in the United States and began work as a carpenter—Simões (his brother) brought him in to work on the Martha's Vineyard project.  Sivieri's testimony was generally consistent with that of Simões and Pereira as to how their business relationship(s) began.  Nothing suggests that Sivieri himself initiated the relationship with Simões or Pereira, let alone that he targeted them based on a belief that they would not know or assert their rights as workers.

[11]  It does not affect any analysis here, but a careful review of the cited trial exhibit shows that the discovery disclosures appear to have been erroneously dated in April 2010 rather than 2011.  A 2011 date would have been the only possibility, given that the associated complaint was filed in November 2010 and that judgments were initially entered in that matter in March 2012.

18

Having recounted some of the bankruptcy court's findings, we come to an important juncture and observe something that was missing: there was no factual finding that Sivieri knew the first thing about the Massachusetts independent contractor statute when the appellants worked with him. And the record does not compel any such finding. To be sure, the bankruptcy court did discuss competing evidence of the extent to which Sivieri had control over Simões and the framing crew, which touches on an element of the independent contractor statute. The bankruptcy court did not, however, make explicit findings about Sivieri's degree of control and did not definitively connect any discussion about control to Sivieri's knowledge or beliefs about independent contractors or employees.[12]

### (b) Reviewing Intent-Related Findings

On appeal, Simões and Pereira challenge several findings as clearly erroneous. We are not persuaded by any of these challenges. We address each in turn.

The appellants make their best argument by reading one finding in isolation. As noted, the bankruptcy court found credible Sivieri's testimony "that he believed at the time that he had the right to classify workers as [independent contractors]." In re Sivieri, 2022 WL 4586507, at *5; see also id. at *8. Sivieri never directly stated such a belief. Rather, and in seeming contradiction, Sivieri conceded that, while Simões and Pereira worked for him, he did not believe "that a business is free to decide whether workers are employees subject to wage

---

[12] To be sure, some other findings appear to allude to other legal standards for worker classification, including that there was no evidence that Sivieri's company had entered into written agreements with, obtained certificates of insurance from, or issued tax form 1099 to Simões and Pereira. As discussed below, if there had been evidence that Sivieri's company routinely engaged in these practices with independent contractors, then perhaps the absence of such evidence as to Simões and Pereira would have permitted some degree of negative inference about Sivieri's knowledge. But there was no such evidence.

19

laws or not." Contrary to Simões and Pereira's contention, these two articulations about Sivieri's beliefs are not incompatible, in light of other findings made by the bankruptcy court.

The bankruptcy court accepted Sivieri's testimony that he had routinely treated workers as independent contractors. The court's observations also encompassed that Sivieri knew (1) that workers had to be treated as either employees or independent contractors and (2) that the decision to classify someone as an independent contractor might later be challenged. From this, the court implicitly made reasonable inferences: Sivieri knew that an independent contractor classification differed somehow from an employee classification and that some standard governed this type of determination. Thus, whatever his understanding of the standard, Sivieri believed that it provided some means for defensibly classifying workers as independent contractors but that it also prevented arbitrarily deciding (i.e., not "free to decide") whether workers were employees. In the context of its related findings, the bankruptcy court's one-time phrasing of Sivieri's belief as a "right to classify" does not suggest that Sivieri would have believed in an unfettered right, given that he was aware that his classification could be disputed. It suggests instead that he may have believed that classifying workers as independent contractors was lawful, authorized, or acceptable—not out of bounds—in certain circumstances. This explication shows compatibility between the bankruptcy court's findings and Sivieri's testimony. Thus, we are not convinced of clear error in the bankruptcy court's depiction of Sivieri's base belief at the relevant time.

Moreover, the record amply supports that Sivieri could have believed that classifying workers as independent contractors was permissible. He had done this regularly with an array of tradespeople across multiple projects without incident. There is little, if any, evidence in the record contradicting Sivieri's testimony that he viewed all workers as independent contractors for

20

purposes of Massachusetts wage law.  Nothing indicates, for example, that Sivieri (or MFN or

NAS) had previously complied with wage law as to any worker, which could have signaled that a

worker was viewed as an employee for wage law purposes.[13]  Nothing in the record indicates

that Sivieri was aware of others taking a different approach to worker classification.  The

evidence of Sivieri's own work experience and training does not compel an inference of any

specific knowledge of worker classification.[14]

Further, nothing in the record compels one to conclude that, during their business

relationship, Sivieri necessarily viewed Simões and Pereira differently from other workers that

he classified as independent contractors.  Despite this evidentiary gap, Simões and Pereira

attempt to reverse engineer an intent finding by employing the following logic: any person or

entity entering into a relationship with an independent contractor would first execute a written

contract with the contractor and then ask the contractor for proof of its insurance.  Their logic

train continues: because Sivieri did not do either of these things, he must have known that

---

[13]  Although the record indicates that certain of MFN's workers had, at times, been listed as employees for workers' compensation insurance purposes, such a listing can involve different considerations than wage law.  For example, as indicated on insurance applications in the record, there are circumstances in which an employee premium may be charged, even if a worker is not an employee.  Here, the reasons for listing workers as employees were not explored, as Sivieri generally denied any knowledge of the insurance documents and no other witness had personal knowledge of them or of Sivieri's familiarity with such documents.  In any event, the workers' compensation insurance documents alone would be insufficient to compel any inference about Sivieri's knowledge of what constitutes an "employee" or "independent contractor" in another context—wage law—and Simões and Pereira do not argue to the contrary.

[14]  The bankruptcy court did not discuss Sivieri's training and experience in detail, but his testimony on those matters appears to have been the bulk of the evidence.  Sivieri testified that he began working in residential construction in the early 1990s but soon transitioned to work as a union laborer doing "heavy highway work," followed by work as an organizer for the laborers' union, which continued until a couple of years before MFN was formed.  Sivieri agreed that he had received overtime pay as a union laborer, but statements about his understanding of overtime eligibility were not detailed such that any inference could have reasonably been drawn about his understanding of worker classification.  Similarly, Sivieri largely denied that his training as a union organizer had included "labor law," stating that it covered "[j]ust more of how companies did not follow the Prevailing Wage Act," but that topic was not probed.

21

Simões and Pereira were not independent contractors and he must have known, as a corollary, that they were employees. We are unmoved, for reasons we will explain.

There was no evidence that Sivieri, MFN, or NAS consistently entered into written agreements with other workers, and there were no written agreements with any worker in the record. Likewise, there was no evidence that Sivieri, MFN, or NAS consistently obtained proof of insurance from workers during the relevant period—i.e., before Sivieri's business arrangement with Simões and Pereira ended due to the accident. Of the fifteen certificates of insurance in the record, only four are dated within that period, and only one of those somewhat clearly lists a Sivieri-related entity (NAS) as the certificate holder.[15] The remaining eleven certificates are dated after the month in which Simões and Pereira were injured in the jobsite accident.[16] If anything, the evidence might suggest that Sivieri or his office administrator began obtaining certificates of insurance after the accident had highlighted a troubling gap in the company's recordkeeping. The evidence does not suggest that insurance information was routinely collected from workers while Simões and Pereira were working with Sivieri. It also does not suggest that Simões and Pereira were treated differently when purportedly not being required to provide proof of insurance. Moreover, the evidence proves nothing about Sivieri's knowledge and beliefs at the relevant time.

---

[15] The first certificate from the relevant period is dated September 3, 2009, and lists "Chuck Hajjar" as the certificate holder. The record indicates that Mr. Hajjar was the homeowner for the Martha's Vineyard project. The second certificate from the relevant period is dated October 19, 2009, and lists "Charles Hajjar" and "MSN, LLC" (not "MFN") as the certificate holders. The third certificate is dated May 26, 2010, and lists "N a S Development LLC" (presumably, "NAS" was intended) as the certificate holder. The fourth certificate has a partially illegible date that appears to be August 2, 2010, and the certificate holder's name is illegible.

[16] As noted, the record indicates that the jobsite accident occurred on September 11, 2010. Eleven certificates of insurance are dated in or after October 2010. Two of those certificates (both dated October 1, 2010) appear to be substantive duplicates.

Simões and Pereira also appear to contend that Sivieri viewed them differently as evidenced by how closely he supervised their work, but the bankruptcy court observed that the testimony had conflicted on this point, making no finding. In his testimony, Sivieri maintained that, under a construction supervisor's license, he broadly supervised tradespeople working on projects, expressing that he lacked necessary knowledge for detailed supervision of framing and other work. Even if the bankruptcy court did not credit Sivieri's testimony about his own skill set, the record contains minimal, if any, support for the notion that Sivieri had direct experience in framing or carpentry. That is, the record does not tend to show that Sivieri could have supervised Simões and Pereira so differently from other tradespeople generally under his supervision such that one might reasonably infer that he cannot have believed that Simões and Pereira were independent contractors.[17]

Simões and Pereira also insinuate that Sivieri cannot have believed that it was permissible to classify them as independent contractors because, after the jobsite accident, in addressing their workers' compensation insurance claims, Sivieri admitted that they had been employees. There are multiple reasons why this purported admission does not show clear error in the bankruptcy court's finding about Sivieri's belief at the relevant time. The record indicates that Sivieri's statements about Simões and Pereira having been employees came *after* their business arrangement had ended and thus might not be indicative of what Sivieri knew when they worked with him. The statements came in a context other than wage law and would not

---

[17] In this and other arguments discussed later, Simões and Pereira appear to reference the various criteria under the independent contractor statute. Presumably, during the wage law case in state court, Sivieri made arguments and the state court made findings as to such criteria. Those findings are not part of the record here. Ultimately, from the mere fact of Sivieri's failure to rebut the employee presumption in state court, it would not be reasonable to infer that he had knowledge or beliefs at the relevant time that would show a deliberate misclassification of Simões and Pereira as independent contractors.

necessarily reflect Sivieri's beliefs for wage law purposes. Sivieri may have been incentivized, after the jobsite accident, to avoid telling the truth. As the bankruptcy court found: "[Sivieri] attempted to manipulate [Simões's and Pereira's] employment status for the benefit of his company to obtain workers' compensation insurance coverage for their injuries." See In re Sivieri, 2022 WL 4586507, at *5; see also id. at *4, *8. That is, seeking to limit his company's liability, Sivieri expediently professed that Simões and Pereira had been employees.[18] We note some inherent tension in the appellants' efforts to undermine Sivieri's credibility generally and their current insistence that the bankruptcy court was required to make a key factual finding based entirely on something that Sivieri said elsewhere. In any event, there is no discernible error in the bankruptcy court's finding that Sivieri believed at the relevant time something that was different from what he later professed expediently.

Simões and Pereira also suggest that the bankruptcy court overlooked or undervalued circumstantial evidence of possible financial motives for Sivieri to have deliberately misclassified them as independent contractors.[19] Simões and Pereira assert that Sivieri's bankruptcy schedules and role defending MFN's position in a certain lawsuit each provide evidence to support an inference of financial distress at the relevant time. We do not view the evidence in the same way.

---

[18] From the record, including Exhibit 59 with certain of Sivieri's discovery disclosures in the wage law case, it appears that Sivieri would have been, around the same time, taking the position that Simões and Pereira had been independent contractors for wage law purposes.

[19] To form certain arguments here (and elsewhere), Simões and Pereira misconceive or misconstrue statements in the bench ruling. As one example, they assert that the bankruptcy court "saw no evidence [that Sivieri] avoided paying his 'known liabilities.'" The bankruptcy court's statement, however, was that "there is no evidence that [Sivieri] *diverted assets* resulting in known liabilities going unpaid." In re Sivieri, 2022 WL 4586507, at *8 (emphasis added). As another example, although Simões and Pereira initially quote the bankruptcy court correctly as stating that there was "no credible material evidence" on one point, discussed infra, they then paraphrase the statement as "no evidence at all" and attempt to refute that instead.

24

As a threshold matter, Sivieri's bankruptcy schedules were not admitted in evidence and Simões and Pereira identify no request for the bankruptcy court to take judicial notice of them. Nor were any schedules included in the record on appeal. Even if judicial notice were taken of the contents of Sivieri's schedules, however, they simply do not establish a picture of relevant financial distress, as the appellants now contend. As listed on his schedules and amended schedules, Sivieri's only debt that predates the debt to Simões and Pereira is one related to a mortgage loan, and there was no evidence in the record as to whether that mortgage loan was, or was not, in default at the relevant time. As to the MFN-related litigation, the record indicates that there was purportedly a contractual dispute and not necessarily that MFN failed to pay a debt because of financial distress.

Simões and Pereira also find support for their theory of the case in what they characterize as Sivieri's, MFN's, and NAS's financial stability. This, they say, shows that Sivieri had reason to deliberately misclassify them, disputing the bankruptcy court's observation that there was "no credible material evidence" of Sivieri having been enriched by the misclassification. Simões and Pereira point to the same sparse evidence of enrichment—namely, some vague testimony from Sivieri that was unsupported by any other evidence in the record—that the bankruptcy court

acknowledged but declined to draw inferences from.[20] Given the meager evidence, Simões and Pereira have shown neither a clear error nor an inference that had to be made.

Finally, Simões and Pereira appear to offer two further arguments that the bankruptcy court disregarded evidence contradicting any belief that it was permissible to classify them as independent contractors. Although these arguments were not well developed, we reject them because both rely on mischaracterizations of Sivieri's testimony.

First, Simões and Pereira imply that Sivieri testified to paying all independent contractors in lump sum milestone payments but treated Simões and Pereira differently by paying them as hourly workers. Sivieri testified, however, that his payment method generally depended upon whether a worker had supplied materials—paying milestone payments if the worker had supplied materials and paying hourly otherwise. Simões and Pereira identify no evidence to the contrary.[21]

---

[20] For example, Simões and Pereira repeatedly assert that Sivieri obtained a $300,000 personal loan on his own, which they contend would not have been possible without Sivieri's businesses having succeeded due, at least in part, to not paying overtime compensation to them and instead paying Sivieri such that his creditworthiness was enhanced. The bankruptcy court recognized the tenuousness of this contention and declined to draw any inference. As to the purported loan, Sivieri's testimony is the only evidence. He testified that he borrowed "maybe $300,000" through a phased infrastructure construction loan from BuyAmerica. Sivieri did not state that it was a personal loan or that he obtained it alone, or even when it was obtained. The record contains no documentation about the loan. It also contains no documentation of MFN's, NAS's, or Sivieri's financial condition. As the bankruptcy court acknowledged, "[Simões and Pereira] were handicapped in part by a lack of records" because Sivieri "claim[ed] that records were destroyed when he was unable to maintain a storage locker." In re Sivieri, 2022 WL 4586507, at *5, *8. The record indicates that MFN was dissolved in 2010 and NAS was dissolved in 2013. Thus, the lack of available documentation in 2020 and beyond for the adversary proceeding might have been unfortunate but not necessarily surprising.

[21] To the extent that Simões and Pereira suggest that being paid on an hourly basis should be indicative of employee status for wage law purposes, it would not be conclusive. An independent contractor can be paid on an hourly basis if the parties have so agreed. Nothing in the statute takes payment structure into account as a factor for determining whether a worker is an independent contractor. See Mass. Gen. Laws ch. 149, § 148B(a).

Second, throughout their appellate brief, Simões and Pereira characterize Sivieri's business as "residential framing." They took a different tack at trial, characterizing it as "residential construction," with which Sivieri agreed. Putting the shifting characterizations aside, we assume that the appellants are now attempting to align Sivieri's usual course of the business more closely with the services that they performed.[22] Continuing on, they contend that Sivieri cannot have believed that they qualified as independent contractors because he would have known that their services were not being performed outside that usual course of business, as required for independent contractor status under wage law, see Mass. Gen. Laws ch. 149, § 148B(a)(2). The argument fails not just because it relies on recharacterizing the business but also because they do not identify evidence that Sivieri was aware, at the relevant time, of this component of worker classification under wage law.

In sum, we see no clear error here. The bankruptcy court's factual findings related to intent are supported by the record. To recap, the findings and record support that Sivieri classified Simões and Pereira as independent contractors while perceiving that such a classification could be advantageous to his business and that it came with some risk of being disputed. Such a perception would not be inherently suspect. As discussed, wage law recognizes the possibility of legitimate independent contractor arrangements, which can be to businesses' advantage, while also creating risk for businesses through the employee presumption, if the arrangement is ever disputed. The record does not permit a reasonable inference that Sivieri

_____

[22] Although the use of "framing" as the descriptor might have some support in the record, it is far from conclusive. For example, on a workers' compensation insurance application dated in 2007, about a month after MFN was organized, MFN's business operations were described as "framing of one & two story frame dwelling[s.]" Sivieri disavowed knowledge of the application but agreed that it correctly described MFN's business, adding "[t]hat would've been a limit[] of my [construction supervisor's] license." Other testimony and documentation indicated that MFN's and NAS's projects involved construction more broadly to include, for example, plumbing, electrical, and site work.

targeted Simões and Pereira, based on immigrant status and related factors, to deliberately deprive them of employee protections under wage law. Likewise, the thin and conclusory evidence of business success does not permit a reasonable inference that financial motivations prompted a deliberate misclassification. Further, regardless of the degree to which Sivieri controlled or supervised the work, it would not suggest deliberate misclassification without first some evidence that he was aware that control could affect a worker's independent contractor status. The findings and record also support that, at some point after the jobsite accident, Sivieri perhaps realized that classifying Simões and Pereira as employees instead might have been more advantageous for workers' compensation insurance purposes. Finally, the findings and record support that Sivieri's taking of a self-serving position for insurance purposes damaged his credibility, but they do not prompt the conclusion that he deliberately misclassified Simões and Pereira before any claims arose.

### (c) Reviewing Intent-Related Conclusion

We see no reversible error in the bankruptcy court's statement or application of the law as to intent under § 523(a)(6). In its bench ruling, the bankruptcy court set forth the standard for willful injury under § 523(a)(6), incorporating correct information about the requisite intent and acknowledging binding precedent for that standard such as Geiger. More specifically, the bankruptcy court accurately observed that "recklessly or negligently inflicted injuries are not excepted from discharge under § 523(a)(6)." In re Sivieri, 2022 WL 4586507, at *2. Thus, to evaluate Sivieri's intent, the bankruptcy court appropriately focused its analysis on Sivieri's knowledge and beliefs at the relevant time. In particular, the bankruptcy court considered whether Sivieri had deliberately misclassified Simões and Pereira as independent contractors knowing that it would improperly deprive them of an entitlement to employee benefits under

28

wage law—namely, overtime pay. Such consideration led to the bankruptcy court's conclusion that the evidence was insufficient to persuade the court that "[Sivieri] intentionally avoided a known legal obligation." In our discussion above, we concluded that the bankruptcy court committed no clear error in its intent-related factual findings. Thus, we see no basis to disturb the conclusion about insufficient evidence, which stemmed from applying correct legal standards to those findings.

Nevertheless, we briefly address certain additional arguments from the appellants related to the bankruptcy court's legal conclusions. To reach its conclusion about insufficient evidence, the bankruptcy court contrasted the matter at hand with two prior wage law-related nondischargeability decisions under § 523(a)(6) on which Simões and Pereira relied: Chaves v. Ruhland (In re Ruhland), Ch. 7 Case No. 11-19510-JNF, Adv. No. 11-1322, 2013 WL 1088737 (Bankr. D. Mass. Mar. 13, 2013) and Faria v. Silva (In re Silva), Ch. 7 Case No. 12-17413-WCH, Adv. No. 12-1274, 2014 WL 217889 (Bankr. D. Mass. Jan. 21, 2014). On appeal, Simões and Pereira maintain that their circumstances are analogous to those in Ruhland and Silva, both of which had debtors who were shown to have had the requisite intent for willfulness. In their arguments, Simões and Pereira largely assume or insist, without sufficient support, that Sivieri knew all along that they could not be classified as independent contractors. From that premise, they insist that he engaged in a knowing failure to pay overtime compensation. Yet, evidence to support that conclusion or Sivieri's awareness of a classification issue is precisely what is lacking here. Focusing the analysis accordingly shows that Ruhland and Silva are easily distinguished.

Ruhland and Silva both involved employers' outright failures to pay promised amounts, and neither case turned on worker classification. Rather, both cases turned on deceitful

29

circumstances related to nonpayment.[23]  Here, Sivieri paid as agreed.  That amount turned out later to have been insufficient because he was unable to rebut the employee presumption and was thus found strictly liable for unpaid overtime premiums.  As indicated, whether Sivieri knew during the relevant period that the amount was insufficient (due to a deliberate misclassification) is key here but is not established on this record.[24]

Overall, as the bankruptcy court's decision indicates, the record fails to rule out that Sivieri acted merely negligently or recklessly when classifying Simões and Pereira as independent contractors.  Although the bankruptcy court might not have so squarely stated it, the bottom line is this: the record lacks evidence to compel a conclusion that Sivieri viewed Simões and Pereira as employees at some point before the accident or that he knew before their business arrangement ended that treating them as independent contractors was incorrect.  Such a conclusion would be necessary, as discussed above, to show that Sivieri acted with the desire, knowledge, or belief that Simões and Pereira would be deprived of a wage law entitlement.

---

[23]  In Ruhland, there was no question that the creditor had been an employee and that the debtor had been on notice that failing to pay wages to employees constituted wage law violations, as he had previously been investigated for such conduct and had resolved that matter by agreement with state officials, including by promising to comply with specific wage law provisions going forward.  Then, within only a few months, he had begun knowingly failing to pay wages again and instead gave business income to his spouse for personal expenses.  In Silva, there was no indication that the debtor had prior knowledge of wage law, but he knew that he had promised to pay the worker and then failed to pay her.  The circumstances surrounding his breach of that agreement, apart from any wage law implication, are what supported a limited nondischargeability finding under § 523(a)(6).  For instance, he had repeatedly induced the worker to continue providing services even when he knew that business was dwindling and that he was making no effort to turn it around.  Then, rather than paying her as promised, he used business income for personal expenses.  Each of these cases involved a debtor who *knew* that the act (breaking a promise to pay for services performed) would lead to an injurious consequence (depriving the worker of amounts to which the worker was legally entitled—whether by statute or contract).

[24]  Further, in looking to Ruhland, Silva, and other cases, the bankruptcy court did not, as the appellants now contend, require proof of deceit or any other intentional tort.  Nor did it require them to establish that Sivieri personally benefitted from classifying them as independent contractors or that Sivieri had promised to pay them overtime.  The bankruptcy court simply looked to such factors as being possible indicators of Sivieri's intent, as courts had done in other cases.

Thus, we see no error in the bankruptcy court's conclusion that the evidence was insufficient to show that Sivieri had the requisite intent.

**CONCLUSION**

Simões and Pereira suggest that, based on his extensive credibility issues, Sivieri is not the "honest but unfortunate debtor" that bankruptcy is intended to benefit. Maybe they are correct. The bankruptcy court observed—and seemingly for good reason—that Sivieri's testimony was implausible and inconsistent with his testimony in other proceedings. But a general lack of credibility does not amount to intent to injure. The appellants may have succeeded in proving that they were employees for purposes of Massachusetts wage law, something that was already established by the state court. They may also have succeeded in painting Sivieri as a person who ignored certain legal and business formalities and who was willing to change his "story" to suit his needs. That success is not a proxy for the type of intent finding that was necessary for them to except their debts from discharge under § 523(a)(6). We agree with the bankruptcy court that the evidence here, in what must be a fact-intensive inquiry, is insufficient to require that Sivieri face his debts to Simões and Pereira indefinitely.

For the above reasons, we **AFFIRM** the judgment.

**Lamoutte, U. S. Bankruptcy Appellate Panel Judge, Concurring.**

While I am compelled by the deference due to the bankruptcy court's findings of fact to concur in the majority's affirmance of the bankruptcy court's decision, I write separately for two reasons: first, to express disagreement with certain inferences made by the majority in support of the bankruptcy court's ruling; and second, to express my view regarding the record and what I understand it reflects regarding Sivieri's intent. The first objective may be stated simply: I do not agree with the majority that, where the record is less than explicit, for the purposes of our review, we may "assume that, on disputed questions of material fact, the [bankruptcy] court made findings of fact that are consistent with, and support, the court's ultimate decision, namely, the entry of judgment in favor of Sivieri." The second objective— to which the remainder of this concurrence is devoted—is necessarily more complex, involving difficult questions of intent and credibility.

In affirming the judgment, the majority concludes that the bankruptcy court did not commit clear error in finding that Sivieri's debt for unpaid overtime pursuant to the state court judgments did not constitute a willful injury within the meaning of § 523(a)(6). If I were the trier of fact, however, I would have been inclined to find differently on this record.

"[A]bsent direct evidence of a debtor's specific intent to injure, a creditor can satisfy the 'willful' component by proving facts from which the Court may infer that the debtor undertook the act with the belief that the consequences of the act were substantially certain to occur." Anaya v. Cardoza (In re Cardoza), 615 B.R. 901, 908 (Bankr. D.N.M. 2020) (citations omitted); see also In re Ruhland, 2013 WL 1088737, at *9 ("To establish willfulness, the Plaintiff was required to prove that the Debtor intended to cause injury to the Plaintiff or the Debtor acted in

a manner that he knew or was substantially certain would harm the Plaintiff.") (citation omitted). Thus, courts must examine "the entire circumstances surrounding the non-payment of wages," including the presence of any "aggravating factors surrounding the non-payment . . . ." Ventura v. Donna (In re Donna), No. 17-2217 (TFH), 2019 WL 5550596, at *6 (D.D.C. Oct. 28, 2019).

Here, the record discloses aggravating circumstances which speak to Sivieri's willfulness. From the outset, the record reveals Simões and Pereira worked 52 weeks a year, six days per week, under Sivieri's supervision. The record further reflects a marked difference in the parties' sophistication. Simões testified at trial that he had a middle-school education and began working as a carpenter in 2004, when he arrived in the United States. He also testified that, while living in the United States, he learned to speak "a little bit" of English. Pereira testified through an interpreter that he had a fourth-grade education and that he had worked as a carpenter since coming to the United States in 2005. In total, he had lived in the United States for seven years. He spoke no English when he began working for Sivieri in 2009. In contrast, Sivieri described himself as a "construction supervisor/manager," with an associate degree in business, a construction supervisor's license, and a hydraulics license. Sivieri also testified that before working in the private sector, he had worked for several years as a union organizer. He further testified that he acted as the appellants' manager and supervisor and knew that the law required overtime pay for an employee who works more than 40 hours per week.

The bankruptcy court was not persuaded that Sivieri "took advantage" of the appellants. While I would not have engaged in social or moral polarization, I would have considered the appellants' citizenship status, sophistication, modest education level, and the fact that English is not their native language as aggravating factors. Plainly, they were vulnerable to exploitation.

33

In my view, an evaluation of the totality of the circumstances in this instance required the bankruptcy court to consider the appellants' unique vulnerabilities together with public policy concerns relating to the right to prompt payment of wages and proper classification of employees.[25]  Other courts have pointed to public policy considerations to supply the necessary aggravating circumstances to find culpability under § 523(a)(6) in cases involving nonpayment of regular wages.  See Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1207 (9th Cir. 2001); Ruhland, 2013 WL 1088737, at *11.  As Jercich noted:

> Wages are not ordinary debts. Because of the economic position of the average worker and, in particular, his family, it is essential to the public welfare that he receive his pay promptly.  Thus, the prompt payment of wages serves society's interest through a more stable job market, in which its most important policies are safeguarded.

238 F.3d at 1207.  Under the circumstances of this case, the policy interest supporting the prompt payment of overtime wages is arguably especially keen.  Combined, the foregoing aggravating factors are, in my view, sufficient to support a finding that Sivieri acted willfully.

In making the willfulness calculus, I am influenced by the bankruptcy court's own credibility assessments.  The bankruptcy court found the appellants to be "credible and forthright in their testimony."  In contrast, it found that Sivieri held self-serving beliefs, lacked credibility, and was "willing to testify to suit his purposes."

---

[25]  See Parris v. Sheriff of Suffolk Cnty., 110 N.E.3d 457, 463 (Mass. App. Ct. 2018) (referencing Massachusetts' "fundamental public policy to provide strong statutory protection for employees and their right to wages") (citation and internal quotation marks omitted); Bos. Police Patrolmen's Ass'n v. City of Bos., 761 N.E.2d 479, 482 (Mass. 2002) (stating the purpose of Mass. Gen. Laws ch. 149, § 148 is "to prevent the unreasonable detention of wages"); see also Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 Fed. Reg. 1638 (January 10, 2024) (to be codified at 29 C.F.R. 795) (providing new guidance on employee classification in an effort to combat employee misclassification).

Still, the U.S. Supreme Court instructs that, under the clearly erroneous standard, if the trial court's "account of the evidence is plausible in light of the record viewed in its entirety, [the reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson, 470 U.S. at 574 (1985); see also Boroff v. Tully (In re Tully), 818 F.2d 106 (1st Cir. 1987) (applying Anderson and the clearly erroneous standard in a § 727(a)(4)(A) case). "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*" Anderson, 470 U.S. at 573 (citation omitted).

Although my assessment of the totality of the circumstances may have resulted in a finding that the appellants met their burden to demonstrate that Sivieri acted willfully, the "clearly erroneous rubric" controls review of this case. See In re Tully, 818 F.2d at 112. Application of that standard requires endorsement of the result below. While I might have weighed the evidence differently, I cannot say the bankruptcy court's view of the evidence was either impermissible or implausible. See Anderson, 470 U.S. at 574. I am also mindful that I am required to defer to the bankruptcy court's credibility assessments. Id. at 575. For these reasons, I concur with the ultimate decision to affirm.